an administrative matter here within the court. There's Raina. I move the admission of John A. Kelly, who is a member of the bar in good standing of the highest Court of Virginia. I acknowledge of his credentials and I'm satisfied that he will possess the necessary qualifications. Motion, gentlemen? Judges? Looks like the motion's been granted. Jack, you've been my clerk for over a year now and we're going to miss you. You know, you brought great skill and talent to my chambers as a law clerk during the past year. In addition to your legal acumen, I've really grown to respect and appreciate your discipline. You're a triathlete, you're a marathon runner, running the Boston Marathon a number of times, including this pastime. You even got my chambers running. And you got me running. And if you can do that, then that's a big challenge. I've come to respect your legal skills and I know that you're a great practitioner and student of the law. And I know that you're going to achieve great things and I expect great things from you, Jack. Please raise your right hand. Be solemnly aware that you will report yourself as an attorney and counselor of this court, a private and in-place law, and I will support the constitution of the United States of America. Welcome to our United States Court of Appeals. You may be seated. We have three cases for argument this morning and we have three cases that are submitted on the brief. The first case is Jackson v. GPO. Counselor Hannan, are you ready? Yes, Your Honor. Good morning and may it please the court and congratulations to Mr. Kelly. I was also moved in by a judge I clerked for, but it was only a one panel court, one judge panel at the time that I was moved in. I hope he doesn't have a job with the government. I wanted to talk a little bit about Ms. Bolden Reed, who was the woman at the government printing office who gave the instruction in the breathalyzer test because I think that this entire case revolves around Ms. Reed. The proposal alleged in its last count that Corporal Jackson did not uphold the responsibility of acting favorably to the UPB both on and off duty and that she participated in an incident involving moral turpitude as a consequence of the allegation that she went to Ms. Bolden Reed and tried to get her to tell the lieutenant and sergeant that you were in the class and were excused by her since she was already certified. Ms. Bolden Reed believed... Counselor, your client has... for various reasons, failure to follow instructions, a lack of candor and inappropriate conduct. Yes, sir. If we find just for one of those reasons that that disposes of the case, correct? No, it doesn't because there's no evidence to indicate that the penalty would remain the same. I also believe, Your Honor, that the issue with Ms. Bolden Reed drives all of the other issues because Ms. Bolden Reed was interviewed three times, gave three statements, and never said that Corporal Jackson tried to get her to say that she was excused. And in fact, when she testified live under oath before the administrative judge, again, all she said was that Corporal Jackson came to her and said, just say yes, when the two supervisors come to her. In her opinion, the administrative judge acknowledges that there was no evidence from Ms. Bolden Reed that she was asked to lie by Corporal Jackson. And the administrative judge ignored the fact that the testimony out of this own woman's mouth belied the allegation. She did not believe that Ms. Jackson was trying to get her to lie, and she said nothing, nor was she asked whether the Ms. Jackson, Corporal Jackson, said to her, tell them that I was authorized to leave early because I already had the class. So the issue for the court is, can the administrative law judge take evidence from this witness, which essentially is the absence of any proof that Corporal Jackson tried to get her to lie, and turn it into the opposite, that she tried to get her to lie by relying on statements of other officials and officers at the Government Printing Office? I would suggest that that notion is taking the flexibility of this administrative proceeding, which allows hearsay, way too far. Well, what about the other witnesses that were there during the initial conversation with Ms. Bolden Reed, who testified that they did think that Ms. Jackson was coercing Ms. Reed? Your Honor, if we were in a trial setting where the rules of evidence were being applied, the statements of those witnesses would not be admissible at all because they're pure hearsay. They could only be admitted in an effort to try to impeach the testimony of Corporal Jackson because Corporal Jackson is the one that allegedly said Ms. Bolden Reed. But you said if we were in a court of law, but we're not, we're an administrative proceeding, which that evidence is admissible. That's... it is admissible. But the question becomes really here. Can you take the sworn testimony of Ms. Bolden Reed, who's the fulcrum of all of this, and who says, you know, I felt frightened and a little coerced by the manner in which Ms. Jackson came in, and turn that into an effort by Ms. Jackson together to lie when she didn't say that? That's just taking it too far. You would essentially allow, Your Honor, the officials in the line here, and the evidence is undisputed that they were making book on Corporal Jackson. And the evidence is undisputed from Director Vernon himself that he's a very bright and very good officer. They were making book on her. In this circumstance, can you allow the hearsay statements from these other witnesses to trump what this woman says under oath? And she had three prior statements. In each of those prior statements, she was given the opportunity to say that Ms. Jackson tried to get me to lie. It just didn't happen. And then you buttress that by the fact that one of the lack of candor allegations... Can I just... Yes, sir. Why isn't it enough evidence all by itself this July 11, 2011 letter from Ms. Boulding Reed? I felt that Corporal Jackson was trying to coerce me into lying or covering up what really happened. She didn't ask her to lie. She... The administrative law judge admits there was no evidence that Corporal Jackson tried to get her to lie. She went and said to her, just say yes. That may have been her subjective feeling, but there was zero evidence. In fact, the opposite. That what Corporal Jackson was trying to do, and that's what we're talking about here, that Corporal Jackson was trying to get her to lie. Now, if the allegation were that she was engaging in a threatening activity in the workplace and that Ms. Boulding Reed felt threatened, then that's a different matter altogether. However, the standard for finding misconduct is much, much higher than what occurred here. She had the opportunity three times when interviewed and a final time when agency counsel had prepared the case in testifying in front of the administrative law judge and to say, Corporal Jackson told me to tell them that I released her from the class. I excused her from the class because she already had the certification. She never testified that. That's the allegation. And this is buttressed by the fact that it's obvious that Lieutenant Rivera... To what extent are you relying on a distinction between what Corporal Jackson expressly said or expressly did not say versus an inference about the most natural meaning of what she said, just say yes, as understood by the person to which that sentence, just say yes, was directed? Well, Corporal Jackson had already spoken to Rivera and Solomon and they had accused her of not going to the class at all. And so Corporal Jackson goes to her and says when they come to see you, just say yes. She's asking her to tell the truth. Well, one could draw a different inference because of that word, the expression just say yes. In context, it could very easily mean in fact it feels like it more naturally means keep your testimony limited so that you only give a favorable answer and then stop. But the allegation, Your Honor, is that Corporal Jackson told her to say that she had excused her. And there's no evidence of that. That's the allegation. And so we're talking about whether the proof is sufficient to support that. Well, there were other people at the June 14th meeting when Jackson met with Solomon. Lieutenant Manuel Quibedo was there and that's Solomon's boss and Officer Edgar James who's the union representative. So there was other individuals at that meeting and their testimony was all consistent that they felt that this exchange, that Ms. Jackson was trying to coerce Ms. Bowling-Reed. Judge, I would suggest that what they did is when they decided they were going to package charges against Corporal Jackson, they went back and they packaged this as part of the allegations. I understand that Director Vernon was alarmed when Officer James reported to him his version of the conversation with Ms. Bowling-Reed. I mean, Officer James even said the union isn't going to support this type of conduct. That's a different issue as to whether he fulfilled his fiduciary duty. So the issue for Director Vernon was whether in fact she tried to get Bowling-Reed to lie. And there's no evidence of that. And one of the things that I find remarkable here is that at page 2002 of the transcript, I asked, I'm sorry, Mr. Crowley asked Director Vernon if Ms. Bowling-Reed told you... I'm sorry, what are you reading from, please? Sir? Page number, please. Page 202 of the transcript. 202. 202 of the transcript. At line 13, Mr. Crowley asked Director Vernon, quote, if today Ms. Bowling-Reed told you that Jackson did not ask her to say that she was excused from class early and Corporal Jackson agreed that she did not say that, would that change her decision? And the answer was, no, sir. So you would believe change over both Ms. Bowling-Reed and Corporal Jackson? Answer, yes, sir. That's the height, in my view, of an arbitrary and capricious decision maker when the person who is alleged to have been the one whose testimony was trying to be fabricated, who was being interfered with, who was almost obstruction of justice, doesn't recite the actual facts of that act. Counselor, you're into your rebuttal time now. Do you wish to preserve it? You're a minute over into your rebuttal time. I would like to take one more minute to say that I think it's important to understand that one of the allegations of a false statement was that she said that she went to the class at 11.07, and that was the printout of the breathalyzer. Lieutenant Rivera, who is the one that she said this to, knew that the breathalyzer times were inaccurate, so he couldn't possibly have believed when she showed him that breathalyzer time that she was telling him she was there at 11.07. And how can they interpret that to suggest that she went there and was immediately excused because there were three times on the breathalyzer, the last time being 11.20. So clearly she was in the class for at least 15 or 20 minutes, and for them to allege that she represented that she was excused from the class in the face of that, I think is a distortion in an effort to try to get rid of a thorn in the side of the director. Thank you, Your Honor. Counselor Kerlan? Yes, Your Honor. Good morning, Your Honors, and may it please the Court. Ms. Jackson's appeal in this case invites the Court to do precisely what it has repeatedly said it will not do, which is re-weigh the evidence on the record   Ms. Jackson's appeal, in this case, who had all of the witnesses and all of the evidence in front of her made in this case. We've cited the Henry case for that point, but you can sight-check the Henry case. This Court has cited that case over and over and over again for the proposition that under these circumstances, when there is an administrative judge who has had an opportunity to observe all of the witnesses, and in this case there were a lot of witnesses, there were four separate witnesses in three different conversations who watched Ms. Jackson, listened to Ms. Jackson tell this story, first to her supervisors, Sergeant Solomon and Lieutenant Rivera, then her conversation with Ms. Boulding-Reed, and then her conversation with Director Vernon. And one of the witnesses, Officer James, who at the time was in the position of being Ms. Jackson's own advocate, watched her go through three iterations of this conversation. All of these witnesses came away with the impression that Ms. Jackson was attempting to excuse her not being at the training when she originally ran into her supervisor by claiming that she had originally been at the training, relatively on time, and then being excused. So this is not an instance of a mere miscommunication, as Ms. Jackson claimed. I'll break from my initial prepared remarks just to point out an absolutely canonical example of what I'm talking about when I say Ms. Jackson invites this Court to re-weigh the record. And that is the transcript section that my colleague read to Your Honors in his opening remarks. That is the transcript session where counsel for Ms. Jackson asked Director Vernon, the deciding official, well, if you didn't have Ms. Boulding-Reed's testimony on this, would you still have made the same decision? And he said, absolutely yes. I would believe Officer James, who is in the position of Ms. Jackson's union rep and had absolutely no reason to fabricate his testimony, who consistently testified that this was about Ms. Jackson claiming that she had been excused from class, even if Ms. Boulding-Reed claimed otherwise. And he went on to explain that, among other things, that when he spoke to Ms. Boulding-Reed, she was shaken, she was frightened, and the term he used was she was shaking like a leaf. And he essentially said, especially given that, certainly I would trust Officer James who was there and not the target of these instructions to just say yes, but was able to be a third-party observer and reported consistently with everyone else that she was saying that she had to be excused. And the argument I heard coming from counsel for Ms. Jackson was, well, you shouldn't believe that. That's arbitrary, that's wrong, because you shouldn't have believed Officer James, you should have believed someone else. And that's precisely what this court said. Again, it doesn't do, that's re-weighing the evidence that was before the administrative judge who had the opportunity to determine, I'm sorry, observe all of these witnesses, determine who was credible. It certainly, there was certainly an extensive amount of evidence on all of these issues that supported the decision. This isn't an instance, for example, like some of the cases that Ms. Jackson has cited where, and I'm thinking specifically of the Wade case and the Spurlock case that she cited in her reply brief, where the court said, well, the administrative judge or the decision below relied on one very flimsy piece of evidence and that doesn't constitute substantial evidence. Let me ask you the same question I asked your colleague. If we affirm on, let's say, the candor issue, the lack of candor issue on that charge, does that dispose of the entire case? I would say, Your Honor, Do we have to affirm all four charges? No, Your Honor. Director Vernon, and this is at page A100 of the record, when I say A100, that's our appendix that we file. Director Vernon, in his decision, indicated that the second two charges, the lack of candor and inappropriate conduct charges, would constitute a sufficient basis to remove Ms. Jackson's standing alone. So he didn't rely on one of the charges, he relied on two. As a reminder, one of those two charges, the lack of candor charges, had two specifications and in order to sustain that charge, only one of those specifications has to be supported. So the one that he said wouldn't have affected anything was the one about failure to follow the instruction to show up at this training session in the first place? That's right. He said that was a serious charge, but that the other two standing alone were sufficient and that's important in the context of the briefing here because the various harmful error allegations that Ms. Jackson has made in her brief relate to the failure to follow instruction charge. Even though that's a serious charge, it makes the allegations effectively moot because Director Vernon stated that he would have removed her based on the other two charges. Just focusing on the inappropriate conduct charge, there are a number of ways in which counsel for Ms. Jackson was erroneous in his characterization of the record, so I just wanted to correct those briefly on the record. The first is he said that effectively that Ms. Bouldingby didn't say anything to corroborate what the other witnesses said and that's not entirely true. In the record that Your Honor cited, which is at page A66, I'm sorry, in the letter that Your Honor cited, which is page A66 of the record, which we would agree amply, among other things, amply supports the agency's determination here, Ms. Bouldingby made clear that the issue that Ms. Jackson came to discuss with her or was telling her that her supervisors were coming to discuss was what time that she had been at the training and that's consistent with the story. Certainly there's room for witnesses to discuss the same type of issues in different ways and that the issue of that being about time or it being about whether she was excused from class, these are all aspects of the story that Ms. Jackson told her supervisors. The second is when counsel discussed that Ms. Bouldingby never said that she was told to lie or anything of that nature, actually Ms. Bouldingby on several occasions indicated that she felt that Ms. Jackson was essentially asking her, this is particularly at page 216 of our appendix, she was being asked to be dishonest, to cover things up. Officer James, this is at page 196 of the record, confirmed that it appeared to him that Ms. Jackson was attempting to coerce Ms. Bouldingby and to cover things up. The other important thing to add is that Officer James' testimony is absolutely not hearsay because sure, he put in a statement, but he also came in and testified in court and this is at several places in the record, but the one I have noted here is page 195 of our appendix and through his testimony after that, Officer James testified directly in court that Ms. Jackson instructed Ms. Bouldingby to say if I was excused, tell them if they ask if I was excused, say yes. The other thing I would add is that, I'm sorry, two other quick things to add, which is that Director Vernon also testified to that fact. He testified essentially that Ms. Jackson told a story to him that was consistent with the story that she told to everyone else. He testified that when he spoke to Officer James and Ms. Bouldingby directly after the incident, that both of them, and this is at page 226 and 228 of the record, that all of them reported to him that Ms., I'm sorry, both of them reported to him that Ms. Jackson had instructed Ms. Bouldingby to confirm that she had been excused from class to confirm the story. And so while that didn't come, well, Director Vernon was not there, he certainly can report on what the witness is in this context, which is an administrative context, not in district court, can report on those witnesses, and that just further confirms. The last point I have on this issue, Your Honor, is just that this is not a case where the judge ignored this evidence. The administrative judge at page A20, I'm sorry, A21 of our appendix, discussed a strong analysis of these issues, and to her credit, she made clear that yes, Ms. Bouldingby's testimony differed somewhat from Officer James about the extent of what Ms. Jackson had said, but she concluded, and reasonably so from the evidence, that the point of the story, as Your Honor has noted, during opposing counsel's remarks, was that Ms. Jackson was instructing Ms. Bouldingby to say yes, regardless of the truth, and that was heightened by the furtive movements that Ms. Bouldingby observed and the implication of the just say yes. And that's certainly sufficient to support the charge, which involved allegations that she was acting in a way that was unbecoming to an officer and had asked Ms. Bouldingby essentially to be untruthful about the issues surrounding her attendance at training. So unless there are further questions, I'm concluded. Thank you. Thank you. Mr. Hannon, you have three minutes left, and I'll restore you back to four in the event that you need that much. Thank you very much, Your Honor. The issue of what happened with Bouldingby presupposes that Corporal Jackson on the 14th told Rivera and Solomon a different statement about what happened than she told Solomon initially. She told Solomon initially, I didn't know that I had the training, and then went on. Now, when she went on to them and gave them the documentation that showed the breathalyzer tests, that was because on the 14th she thought Rivera and Solomon were accusing her of not going at all. And unbeknownst to her, they took that information as some kind of evidence that she arrived at 1107. Obviously, that's the reason for the lack of candor. My position is that Corporal Jackson said, that never happened in that conversation. I never told them that I went and was excused. Why would I? Because you see the three different times that were there. She would have to be profoundly stupid to tell them that she went and left and was excused because there were two other officers who were there. They were interviewed by James. They told James she was there. The problem here is that there was lack of communication on the 14th when Rivera and Solomon and Vernon listened to her and saw these printouts, and they thought she was saying that she was there at 1107 and was there through 1120 and then somehow was excused and then encountered Solomon and went back. It's not possible, and it's profoundly stupid for her to do that. And therefore, that's why it's important that counsel for the government never ask Ms. Boulding-Reed, did she tell you to say that you excused her? It didn't happen. You can't allow Ms. Boulding-Reed's testimony here to be trumped by everything else in the record. Thank you, Your Honor.